SPRINT CORPORATION, Plaintiff,

v.

James H. EVANS, Attorney General of the State of Alabama, Defendant.

Civ. A. No. 93–T–284–N.

United States District Court, M.D. Alabama, N.D.

April 7, 1993.

---

Joseph B. Mays, Jr., Birmingham, AL, Kevin R. Sullivan, Deborah M. Lerner, Pillsbury Madison & Sutro, Washington, DC, David M. Eisenberg and Arthur A. Chaykin, Sprint Corp. Kansas City, MO, for plaintiff.

H. Lewis Gillis, Thomas, Means & Gillis, P.C., Donald V. Watkins, Montgomery, AL, for defendant.

## MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

With this lawsuit, plaintiff Sprint Corporation challenges the "manner" in which defendant James H. Evans, Attorney General of Alabama, seeks to apply the Alabama criminal anti-obscenity statute, 1975 Alabama Code §§ 13A–12–200.1, et seq., to the company's provision of interstate "800" telephone service. Sprint contends that Evans's efforts would violate federal law in two ways. First, application of the state statute as Evans seeks to enforce it is preempted by the Communications Act of 1934, 47 U.S.C.A. §§ 151, et seq., and, second, such application would constitute an unlawful informal system of "prior restraint" in violation of the first and fourteenth amendments to the United States Constitution as enforced by 42 U.S.C.A. § 1983. The court now has before it Sprint's motion for preliminary injunction. For the reasons set forth below, the motion will be granted.

## I. BACKGROUND

Sprint Corporation is an international telecommunications company that provides voice, data, and video transmission services. As a carrier of telephone messages on its telecommunications network, it is a "common carrier" within the meaning of the Communications Act.[1] Among other services, Sprint provides an "800" service, which is offered to subscribers (also referred to as information providers) pursuant to tariffs filed with the Federal Communications Commission ("FCC").[2] To subscribe to an 800 service

---

**1.** Section 153(h) of title 47 provides in relevant part:

"'Common carrier' or 'carrier' means any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or in interstate or foreign radio transmission of energy."

**2.** As part of the Communications Act, Congress created the FCC as the central agency authorized

plan, a subscriber submits a standard enrollment form, which does not require the subscriber to disclose the nature of its business or the purpose for which it intends to use the 800 service. Sprint has over 150,000 accounts for 800 service.

Under an 800 service plan, a consumer calls the 800 number and the party called—that is, the subscriber—is billed a prescribed amount for each minute as toll charges for the call. The 800 service plan, therefore, differs from regular telephone service in that the party called rather than the caller pays Sprint for the call. The caller may buy goods or hear messages provided by the subscriber and pays the subscriber directly. Sprint receives no payment based upon the sales success of the subscriber and has no ownership interest or financial relationship with any of its subscribers for 800 service. Sprint does not participate in the subscribers' billing of the callers to the 800 numbers.

To initiate an 800 service call, a person places the call through his or her local telephone company. The local telephone company then switches the call to a long distance carrier such as Sprint. To complete the call, the long distance carrier generally delivers the call to the subscriber's local telephone company, which then switches the call to the subscriber. Sprint handles over seven million 800-number calls during a normal business day.

If Sprint receives a complaint from a caller about an 800 service number, Sprint first verifies that it, as opposed to another long distance company, operates the 800 number. Sprint also calls the 800 line itself to verify the content of the message. Sprint then informs the 800 subscriber that Sprint has received a complaint concerning the 800 service and asks that the subscriber contact the caller directly about the complaint. Once Sprint notifies the subscriber of the nature of the complaint, it takes no further action.

Sprint receives approximately one complaint a week regarding its 800 service numbers.

On February 5, 1993, Sprint received a subpoena from the Montgomery County Grand Jury commanding it to appear on February 11, 1993 and to produce all records concerning 800 telephone numbers. The production request included all documents pertaining to 16 specific 800 numbers. Twelve of these numbers were issued to subscribers Network Telephone Services and ALMARC, both of which are California companies. With respect to these services, a consumer places a call to the 800 number and is given recorded preliminary information by the subscriber. After the caller arranges an alternative billing method, such as a credit card, the caller can then connect with another random caller, hear a prerecorded message, or speak live with an employee of the subscriber. Both sides agree that all of the telephone numbers under investigation require interstate connections between the callers and subscribers. The calls originate in Alabama, but are completed in other states. As such, the calls involve interstate communications within the meaning of the Communications Act.[3]

Sprint produced documents to the grand jury in compliance with the subpoena. On February 16, an attorney for Sprint, David Eisenberg, contacted Alabama Deputy Attorney General Russell Duraski, who informed Eisenberg that the grand jury investigation concerned distribution of obscene materials by telephone. Duraski mentioned that "GTE" had previously been indicted on obscenity charges in Alabama but did not suggest that Sprint terminate any of its 800 numbers or even review the content of the 800 numbers. On February 19, another attorney for Sprint, Joseph Fine, contacted Attorney General Evans, who told him that Sprint was a target of the grand jury investigation. During the week of February 22,

to execute and enforce the provisions of the Act. *See* § 151 of title 47.

**3.** Section 153(e) of title 47 provides in relevant part:

"'Interstate communication' or 'interstate transmission' means communication or transmission (1) from any State, Territory, or possession of the United States (other than the Canal Zone), or the District of Columbia, to any other State, Territory, or possession of the United States (other than the Canal Zone), or the District of Columbia, (2) from or to the United States to or from the Canal Zone, insofar as such communication or transmission takes place within the United States, or (3) between points within the United States but through a foreign country."

Duraski told Fine that the grand jury was scheduled to meet on February 25 and that the Attorney General's office would present evidence to the grand jury on that date. The Attorney General's office subsequently informed Fine that the date would be rescheduled. On March 2, Duraski told Eisenberg that the grand jury would convene again on March 10 to consider the matter.

On March 8, Sprint filed a motion for a temporary restraining order and a preliminary injunction, seeking to enjoin the Attorney General from pursuing a criminal indictment against Sprint for violating Alabama's anti-obscenity statute in connection with the company's provision of 800 telephone service. Sprint served the motion on the Attorney General the same day. On March 9, a hearing was held on the motion for a temporary restraining order. Sprint maintained that enforcement of the anti-obscenity statute against it would interfere with federal statutory rights because regulation of interstate communications is within the exclusive jurisdiction of the FCC. Sprint also contended that enforcement of the statute would constitute an unlawful system of prior restraint. At the hearing, the Attorney General's office could not state that prosecution of Sprint was not imminent. The court orally informed the parties that a temporary restraining order would be entered and issued a written order and memorandum opinion the same day.

On March 19, the court held a hearing on the motion for a preliminary injunction.[4] Sprint reasserted its earlier arguments regarding preemption and prior restraint. In response to questions from the court, Donald Watkins, counsel for the Attorney General, clarified Evans's position regarding Sprint's liability under the state's anti-obscenity statute in connection with the company's 800 service.[5] According to Evans, the statute requires Sprint to take one of two actions whenever it receives a complaint from a caller that a subscriber's message is offensive in content. Sprint must either report the complaint to a prosecuting attorney or institute a declaratory judgment action against the subscriber. If Sprint takes one of these two actions in response to a caller's complaint, then it is not criminally liable under the statute. According to Evans, Sprint is not obligated to cease carrying a subscriber's message, referred to as "taking down" a subscriber, while these actions are pending. Sprint is obligated to take down a subscriber only once a court has adjudicated the subscriber's message to be obscene. As Watkins explained at the hearing:

"MR. WATKINS: The position would be that if the Court is placed on some judicial notice, for example the [caller's] complaint we've used in this proceeding today, and there is no effort whatsoever to either petition some court somewhere for a formal adjudication of obscenity, or to petition the FCC or some other regulatory body to discontinue that service, then under that scenario, I think Sprint has subjected itself to potential criminal liability under the Alabama act.

THE COURT: Now, what can Sprint do to avoid that? What is it supposed to do? You said it can go to court.

MR. WATKINS: Yes.

THE COURT: And it can get a civil declaration.

MR. WATKINS: Yes.

4. Initially, the hearing on the preliminary injunction was set for March 15. Upon agreement of the parties, the hearing was reset for March 19 and the temporary restraining order was amended to remain in effect until the court resolved the motion for a preliminary injunction, but was not to extend past March 26. This date was subsequently extended to April 6.

5. The relevant provisions of the Alabama anti-obscenity statute at issue in this case are as follows:

"It shall be unlawful for any person to knowingly distribute, possess with intent to distribute, or offer or agree to distribute any obscene material for any thing of pecuniary value. Any person who violates this subsection shall be guilty of a misdemeanor and, upon conviction, shall be punished by a fine of not more than $10,000 and may also be imprisoned in the county jail or sentenced to hard labor for the county for not more than one year."

1975 Ala.Code § 13A–12–200.2(1). The statute defines the term "material" to include "any ... electrical or electronic reproduction, broadcast, transmission [or] telephone communication." § 13A–12–200.1(2). The term "distribute" includes to "transmit, retransmit [or] communicate by telephone." § 13A–12–200.1(3).

THE COURT: Or it could turn it over to some criminal process.

MR. WATKINS: Yes.

THE COURT: And if it did either of those two things, it could continue to carry the message over its lines without exposure to criminal prosecution, assuming it has acted in good faith.

MR. WATKINS: Yes, with respect to that message that it had a complaint on.

THE COURT: That's right, that message.

MR. WATKINS: And they may not know about any other messages in the present or the future.

THE COURT: And Evans is not asking, however, that they independently decide whether something is obscene.

MR. WATKINS: No.

THE COURT: So Sprint itself doesn't have to make that determination by Evans—

MR. WATKINS: No.

THE COURT: According to Evans.

MR. WATKINS: No. We have not asked them to make an independent determination. We merely pointed out that they had done that in one instance."

## II. DISCUSSION

The Eleventh Circuit Court of Appeals has established a four-prong test for determining whether a preliminary injunction should issue. Under this test, the movant must show: "(1) a substantial likelihood that she will ultimately prevail on the merits; (2) that she will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; *and* (4) that if issued, the injunction would not be adverse to the public interest." *Baker v. Buckeye Cellulose Corp.,* 856 F.2d 167, 169 (11th Cir.1988) (emphasis in original).

### A. *Likelihood of Success*

As stated, Sprint asserts two claims in support of its request for a preliminary injunction: first, that the manner in which Evans seeks to apply the Alabama anti-obscenity statute is preempted by the Communications Act; and, second, that such application would constitute an unlawful informal system of "prior restraint" in violation of the first and fourteenth amendments as enforced by § 1983.

### 1. Preemption Claim

#### i.

■ The court must first address Evans's argument that the court lacks subject-matter jurisdiction over Sprint's preemption claim. Relying on *Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 15–16, 103 S.Ct. 2841, 2849, 77 L.Ed.2d 420 (1983), Evans correctly notes that, ordinarily, federal preemption is a federal defense to a state lawsuit and, as such, does not create federal-question jurisdiction. *See also Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63, 107 S.Ct. 1542, 1546, 95 L.Ed.2d 55 (1987). The Supreme Court, however, has held that federal courts have federal-question jurisdiction under 28 U.S.C.A. § 1331 to entertain suits to enjoin state officials from interfering with federal statutory rights:

"It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights. *See Ex Parte Young,* 209 U.S. 123, 160–62, 28 S.Ct. 441, 454–55 [52 L.Ed. 714] (1908). A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is preempted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve. This Court, of course, frequently has resolved pre-emption disputes in a similar jurisdictional posture."

*Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 2899 n. 14, 77 L.Ed.2d 490 (1983) (citations omitted). In *Shaw,* the Court distinguished *Franchise Tax Board* by stating that *Franchise Tax Board* "was an action seeking a declaration that state laws were *not* pre-empted." *Id.* In contrast, *Shaw* presented a situation in which companies were seeking injunctions and declarations against enforcement of state laws that they claimed *were* preempted. *Id.*

Admittedly, the Supreme Court in *Shaw* was addressing preemption claims based on the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.A. §§ 1001, et seq. However, in *Lawrence County v. Lead–Deadwood School Dist.,* 469 U.S. 256, 259 n. 6, 105 S.Ct. 695, 697 n. 6, 83 L.Ed.2d 635 (1985), the Court reaffirmed the "general rule" enunciated in *Shaw* that a plaintiff seeking injunctive relief from state regulation on preemption grounds presents a federal question under § 1331. There, the Court held that a claim of preemption based on the Payment in Lieu of Taxes Act, 31 U.S.C.A. §§ 6901, et seq., presented a federal question for purposes of federal jurisdiction under § 1331. A number of circuit courts of appeal have also found jurisdiction in cases involving preemption by federal statutes other than ERISA. *See, e.g., Playboy Enterprises, Inc. v. Public Service Comm'n of Puerto Rico,* 906 F.2d 25, 29–31 (1st Cir.) (Cable Communications Policy Act of 1984, 47 U.S.C.A. §§ 521, et seq.), *cert. denied,* 498 U.S. 959, 111 S.Ct. 388, 112 L.Ed.2d 399 (1990); *Potomac Elec. Power Co. v. Sachs,* 802 F.2d 1527, 1529 n. 3 (4th Cir.1986) (Toxic Substances Control Act, 15 U.S.C.A. §§ 2601, et seq.), *vacated on other grounds,* 484 U.S. 1022, 108 S.Ct. 743, 98 L.Ed.2d 756 (1988); *First Nat'l Bank of Eastern Ark. v. Taylor,* 907 F.2d 775, 776 n. 3 (8th Cir.) (National Bank Act, 12 U.S.C.A. §§ 21, et seq.), *cert. denied,* 498 U.S. 972, 111 S.Ct. 442, 112 L.Ed.2d 425 (1990); *ANR Pipeline Co. v. Corporation Comm'n of Oklahoma,* 860 F.2d 1571, 1575–77 (10th Cir.1988) (Natural Gas Act, 15 U.S.C.A. §§ 717, et seq., and Natural Gas Policy Act of 1978, 15 U.S.C.A. §§ 3301, et seq.), *cert. denied,* 490 U.S. 1051, 109 S.Ct. 1967, 104 L.Ed.2d 435 (1989).

In both *Shaw* and *Lawrence County,* the Supreme Court appeared to be operating on the assumption that the plaintiff has a valid federal cause of action, an issue analytically distinct from the issue of a court's jurisdiction, although the Court never identified the precise source of the plaintiff's claim in these kinds of preemption disputes. At least one court, the First Circuit Court of Appeals, has found that such claims are cognizable under § 1983. *See Playboy Enterprises,* 906 F.2d at 31–33. Some commentators have concluded that such causes of action arise directly under the Constitution. *See, e.g.,* 13B C. Wright, Federal Practice & Procedure § 3566, at 102 (1984) ("The best explanation of *Ex Parte Young* and its progeny is that the Supremacy Clause creates an implied right of action for injunctive relief against state officers who are threatening to violate the federal constitution or laws.").[6]

In any event, the Supreme Court has not questioned the propriety of allowing a cause of action for preemption claims even when the federal statute whose preemptive power is at issue cannot be the source of the plaintiff's cause of action. On the basis of this authority, this court holds that it has subject-matter jurisdiction over Sprint's preemption claim and that Sprint has a valid federal cause of action. *See Storer Cable Communications v. City of Montgomery,* 806 F.Supp. 1518, 1530 (M.D.Ala.1992) (Thompson, J.). This jurisdiction extends to Sprint's request for declaratory as well as injunctive relief. *See Franchise Tax Bd.,* 463 U.S. at 20, n. 20, 103 S.Ct. at 2851, n. 20.

ii.

Evans's position regarding Sprint's liability under the Alabama anti-obscenity statute reveals that, although the law is a criminal statute condemning the knowing distribution of obscene matter for pecuniary value, Evans is attempting to use it outside this context as a regulatory reporting mechanism when applying it to common carriers such as Sprint.

**6.** The Eleventh Circuit Court of Appeals has written that *Shaw* suggests "that a federal cause of action might be implied to permit a declaratory adjudication that federal law preempts a contrary state law, even if the federal statute does not expressly provide a cause of action." *Legal Envtl. Assistance Foundation, Inc. v. Pegues,* 904 F.2d 640, 643 (11th Cir.1990). The court, perhaps incorrectly, characterized *Shaw* as doing "no more" than indicating "that the Supremacy Clause provides federal jurisdiction for a cause of action implied from the statute, a distinction noted more clearly in dicta in a more recent case, *Lawrence County v. Lead–Deadwood School District." Id.* (citations omitted). The court went on to find that the supremacy clause did not imply a cause of action to review a federal agency's interpretation of a federal law in a proceeding against a state agency. *Id.* at 644. Thus, the case did not involve a claim that federal law preempted a state regulation.

Sprint is facing indictment not for distributing obscene material but solely for failing to comply with certain regulatory reporting requirements concerning messages that are carried over its network. As explained above, according to Evans, in order for Sprint to comply with the anti-obscenity statute it must take one of two actions whenever it receives a complaint regarding the offensive nature of a subscriber's message. Sprint must either report a caller's complaint to a prosecuting attorney or institute a declaratory judgment action against the subscriber. According to Evans, the statute does *not* require Sprint to "take down," that is, cease carrying a subscriber while these actions are pending. Sprint is obligated to take down a subscriber only once a court has adjudicated the subscriber's message to be obscene.

The regulatory reporting function of the statute is laid bare by the Attorney General's admission that Sprint may allow an 800 subscriber to continue using Sprint's network to transmit allegedly obscene messages while a declaratory judgment action or action by a prosecuting attorney is pending. If Evans were genuinely concerned with the distribution of obscene material, then Sprint would not be able to continue to carry the obscene messages. However, pending the outcome of an adjudication, Sprint is allowed to engage in precisely the conduct that the state anti-obscenity statute criminalizes—the transmission of obscene material. Sprint's liability under the statute thus turns on its compliance with certain reporting requirements imposed by Evans and not on its distribution of obscene material. Indeed, the statute is functioning as if it were a regulation passed by the Alabama Public Service Commission requiring common carriers to report obscenity complaints concerning its 800 numbers. Evans's attempt to fit Sprint's conduct within the criminal prohibitions of the state's anti-obscenity statute is thus pretextual. Threatening to indict Sprint under the statute is merely part of an effort to impose new regulatory requirements on the company.

A reading of the Alabama anti-obscenity statute further reinforces the court's conclusion that Evans's use of the criminal statute is a pretext for regulating the interstate activities of the phone company. The statute makes it unlawful to "knowingly distribute ... any obscene material." § 13A–12–200.2(1). "Knowingly" is defined as "doing an act involving a material when the person knows the nature of the material." § 13A–12–200.1(8). A person is considered to know the nature of the material if the person "has a belief or reasonable ground for belief as to the nature of the material which warrants further inspection or inquiry of the character and content of the material." § 13A–12–200.1(10).[7] From the plain language of the statute, it appears that if Sprint were to receive a complaint that an 800 service was transmitting obscene messages, it would be deemed to have knowledge of the nature of the material. Although the statute refers to the possible need for "further inspection or inquiry," the statute in no way suggests that undertaking such an inquiry would in and of itself release a person from liability. A person can avoid liability only by ceasing to distribute obscene material, not merely by reporting its knowledge to a third party. Therefore, the language of the statute indicates that, to avoid criminal liability, Sprint would be required to block a subscriber's number once it received a complaint, even if it sought a declaratory judgment or reported the complaint to a prosecuting attorney. Otherwise, if Sprint continued to transmit the message, it would be "knowingly" distributing obscene material in violation of the statute. Evans's attempt to read into the statute an exception for those who report their knowledge of obscenity complaints to a third party clearly exposes that, in the context of common carriers like Sprint, the statute is being used as a regulatory reporting measure outside its context to punish the distribution of obscene material. The statute is imposing criminal liability for Sprint's failure to report. Thus, in analyzing Sprint's preemption claims, the issue before the court is not whether a state statute criminalizing obscenity is preempted, but whether a state regulation requiring reporting of complaints is preempted.

---

7. Section 13A–12–200.1(10) also provides that a person knows the nature of the material if the person either "knows the nature of the material" or "has reason to know the nature of the material."

■ The supremacy clause of article VI of the United States Constitution provides Congress with the power to preempt state law. *Louisiana Public Service Comm'n v. FCC*, 476 U.S. 355, 368, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986). In the absence of an express statement by Congress that state law is preempted, there are two other bases for finding preemption. First, when the scheme of federal regulation is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," the court should deem that Congress intended to preempt the whole field of state law by "implication." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947); *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 212–13, 103 S.Ct. 1713, 1726–27, 75 L.Ed.2d 752 (1983). Second, state law is preempted to the extent it actually conflicts with federal law, either when compliance with both state and federal law is impossible, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963), or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

■ In determining the preemptive scope of a particular federal law, the court's underlying task is to discern and effectuate Congress's intent. *Cipollone v. Liggett Group, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992) (" 'The purpose of congress is the ultimate touchstone of preemption analysis' ") (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S.Ct. 1185, 1189, 55 L.Ed.2d 443 (1978)). The Supreme Court has cautioned that the striking down of state laws on preemption grounds is generally disfavored. "Consideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress.' " *Cipollone*, —— U.S. at ——, 112 S.Ct. at 2617 (citations omitted).

Sprint maintains that enforcement of the Alabama anti-obscenity statute would violate federal rights because the statute is preempted by the Communications Act. According to Sprint, there are two bases for finding federal preemption. First, the company contends that, in enacting the Communications Act, Congress established a comprehensive scheme for the regulation of interstate communications with the intent to preempt state laws in the field. Second, Sprint maintains that compliance with the Alabama anti-obscenity statute conflicts with Sprint's obligations under the Communications Act.

Sprint bases its claim that the Communications Act has fully occupied the field of interstate telecommunications on § 152(a) of title 47, which provides that the Act "shall apply to all interstate and foreign communications by wire." [8] Sections 151 and 152(b) together implicitly delineate the areas of exclusive federal and dual state and federal control. Section 151 explains that the purpose of the Act is to "regulat[e] interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." Section 152(b) provides for a dual system of federal and state control over regulation of *intra* state communication.[9]

"[N]othing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier, or (2) any carrier engaged in interstate or foreign communication solely through physical connection with the facilities of another carrier not directly or indirectly controlling or controlled by, or under direct or indirect common control with such carrier."

---

**8.** Section 152(a) provides in relevant part:

"The provisions of this chapter shall apply to all interstate and foreign communication by wire or radio and all interstate and foreign transmission of energy by radio, which originates and/or is received within the United States, and to all persons engaged within the United States in such communication or such transmission of energy by radio, and to the licensing and regulating of all radio stations as hereinafter provided."

**9.** Section 152(b) provides in relevant part:

The Supreme Court has explained that, in order to accomplish the goal stated in § 151, "Congress created the FCC to centralize and consolidate the regulatory responsibility that had previously been the province of the Interstate Commerce Commission and the Federal Radio Commission under predecessor statutes." *Louisiana Public Service Comm'n,* 476 U.S. at 369–70, 106 S.Ct. at 1899. The Court further stated: "To this degree, § 151 may be read as lending some support to [the] position that state regulation which frustrates the ability of the FCC to perform its statutory function of ensuring efficient, nationwide phone service may be impliedly barred by the [Communications] Act." *Id.* at 370, 106 S.Ct. at 1899. In fact, the Court's only reservation regarding the preemptive effect of the Act concerned the FCC's jurisdiction over *intra*state matters. The Court found that § 152(b) of title 47 limited the FCC's reach over certain intrastate communications. However, the Court strongly implied that as to regulations affecting interstate communications—that is, those regulations falling outside § 152(b) of title 47—§ 151 broadly preempted state laws.

The Court's suggestion in *Louisiana Public Service Comm'n* regarding the broad preemptive effect of § 151 in the field of interstate communications is consistent with earlier Supreme Court pronouncements on the subject. For example, in *Benanti v. United States,* 355 U.S. 96, 104, 78 S.Ct. 155, 159, 2 L.Ed.2d 126 (1957), the Court stated that the "Communications Act is a comprehensive scheme for the regulation of interstate communication," and, in *National Broadcasting Co. v. United States,* 319 U.S. 190, 219, 63 S.Ct. 997, 1010, 87 L.Ed. 1344 (1943), the Court held that the FCC was given a "comprehensive mandate" and "expansive powers" to regulate interstate wire and radio communications. In fact, the federal government's occupation of the field of interstate communications was recognized by the Court even prior to the 1934 enactment of the Communications Act, which transferred the Interstate Commerce Commission's authority over interstate communications to the FCC. *See, e.g., Western Union Tel. Co. v. Priester,* 276 U.S. 252, 259, 48 S.Ct. 234, 235, 72 L.Ed. 555 (1928); *Western Union Tel. Co. v. Esteve Bros. & Co.,* 256 U.S. 566, 570, 572, 41 S.Ct. 584, 586, 586, 65 L.Ed. 1094 (1921); *Western Union Tel. Co. v. Boegli,* 251 U.S. 315, 316, 40 S.Ct. 167, 167–68, 64 L.Ed. 281 (1920); *Postal Telegraph–Cable Co. v. Warren–Godwin Lumber Co.,* 251 U.S. 27, 30–31, 40 S.Ct. 69, 70–71, 64 L.Ed. 118 (1919). *See also Oklahoma–Arkansas Tel. Co. v. Southwestern Bell Tel. Co.,* 45 F.2d 995, 1000 (8th Cir.1930) ("Congress having taken possession of the entire field, the power of the states to regulate the transmission of interstate messages and interstate facilities for such transmission has been suspended."), *cert. denied,* 283 U.S. 822, 51 S.Ct. 346, 75 L.Ed. 1437 (1931).

Numerous other courts have also found that Congress intended to preempt the entire field of interstate regulation of common carriers. Most notably, the Second Circuit Court of Appeals has held that:

"questions concerning the duties, charges and liabilities of telegraph or telephone companies with respect to interstate communications service are to be governed solely by federal law and that the states are precluded from acting in this area.... It seems to us that the congressional purpose can be achieved only if a uniform federal law governs as to the standards of service which the carrier must provide and as to the extent of liability for failure to comply with such standards."

*Ivy Broadcasting Co. v. American Tel. & Tel. Co.,* 391 F.2d 486, 491 (2d Cir.1968). *See also National Ass'n of Regulatory Util. Comm'rs v. FCC,* 746 F.2d 1492, 1498–1501 & n. 6 (D.C.Cir.1984) (states may not regulate resale of WATS service when part of an interstate communications network because "interstate communications ... are placed explicitly within the sphere of federal jurisdiction by the plain language of the Communications Act"); *Kaufman v. Western Union Tel. Co.,* 224 F.2d 723, 728 (5th Cir.1955) (interstate message transactions are "subject to a national and uniform rule of law"), *cert. denied,* 350 U.S. 947, 76 S.Ct. 321, 100 L.Ed. 825 (1956); *Allen B. Dumont Labs. v. Carroll,* 184 F.2d 153, 155 (3rd Cir.1950) (Communications Act preempted Pennsylvania's censorship of television films transmitted interstate because "Congress intended the reg-

ulatory scheme set out by it therein to be exclusive of State action"), *cert. denied,* 340 U.S. 929, 71 S.Ct. 490, 95 L.Ed. 670 (1951).[10]

Indeed, the only cases in which preemption has been questioned, outside of those involving the federal common law, have involved state regulations aimed at intrastate communication that also affected interstate communication. *See, e.g., National Ass'n of Regulatory Util. Comm'rs,* 746 F.2d at 1499, 1501 & n. 6.[11] These intrastate problems, however, are not present in this case. As noted previously, the telephone calls at issue here were made by callers in Alabama to 800 number subscribers or information providers in California. Both sides agree that the calls are interstate communications within the meaning of the Communications Act.

■■■ Applying the above principles, the court concludes that, to the extent that the Alabama anti-obscenity statute attempts to impose reporting requirements on communications by common carriers, it is interstate in nature and preempted by federal law. As explained above, the statute is being used as a mechanism to impose new reporting requirements on common carriers with regard to their 800 service. Currently, under federal law, common carriers do not have an affirmative obligation to investigate whether their facilities are being used by customers for a lawful purpose. *See Enforcement of Prohibitions Against the Use of Common Carriers for the Transmission of Obscene Materials,* 2 F.C.C.R. 2819, 2820–2821 (1987). Rather, if there is concern regarding the nature of material being transmitted by common carriers, the proper course of action "in light of the possible varying provisions of the numerous states statutes" is for those *"interested parties* to seek a determination in the affected jurisdictions" as to whether the facilities

are being used for an unlawful purpose. *Humane Society of the United States v. Western Union Int'l, Inc.,* 30 F.C.C.2d 711 (1971) (emphasis added). Federal law, therefore, places the burden to investigate on those who are concerned about the nature of material being transmitted. However, the Alabama anti-obscenity statute would impose such a burden on the common carrier. Under Alabama law as Evans reads it, once a common carrier such as Sprint receives a complaint about an 800 service, the company would be required to litigate a declaratory judgment action against a subscriber or to report the complaint to a prosecuting attorney, even though Sprint may not necessarily be an interested party. Moreover, to add to the confusion, Evans does not take into account the "possible varying provisions of the numerous states statutes," *id.;* unlike the FCC, he does not say to which of the many state and federal prosecuting attorneys across the country a common carrier must refer a consumer complaint or in which of the many state and federal courts across the county the common carrier must seek a declaration in order to avoid criminal liability.

If the Alabama Public Service Commission were to pass a regulation imposing similar duties on common carriers, the state regulation would undoubtedly be preempted. It would be considered an impermissible invasion of the FCC's authority to regulate the field of interstate communications. As the Supreme Court has explained, the purpose of preempting state laws that regulate interstate communications is to allow common carriers to perform their interstate functions efficiently without facing varying obligations from state to state. *Louisiana Public Service Comm'n,* 476 U.S. at 369–70, 106 S.Ct. at 1899. To allow each state to impose its own

---

**10.** Indeed, *Kaufman* is binding precedent for this court. In *Bonner v. City of Prichard,* 661 F.2d 1206 (1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit Court of Appeals handed down prior to the close of business on September 30, 1981.

**11.** *Air Transport Ass'n of America v. Public Util. Comm'n of California,* 833 F.2d 200 (9th Cir. 1987), *cert. denied,* 487 U.S. 1236, 108 S.Ct. 2904, 101 L.Ed.2d 936 (1988), involved an intrastate regulation that also incidentally affected

interstate calls. The court held that § 202(a) of title 47 did not preempt a state regulation prohibiting subscribers from surreptitiously overhearing conversations without notice to the parties to the conversation. Significantly, the case did not involve regulation of common carriers. Moreover, the FCC decision upon which the court relied treated the regulation as involving solely intrastate communications. *See Petition for Declaratory Ruling Filed by Aeronautical Radio, Inc. & the Air Transport Ass'n of America,* 102 F.C.C.2d 1 (1985).

duties and requirements governing the interstate transmission of material by common carriers would result in precisely the type of piecemeal regulation that Congress wanted to avoid in passing the Act. The court thus concludes that the Alabama anti-obscenity statute is preempted to the extent it is used for interstate regulation of common carriers.[12]

Because the court finds that the Alabama anti-obscenity statute is preempted to the extent that it attempts to impose reporting regulations on the interstate activities of common carriers, the court does not reach the question whether the Communications Act preempts all state laws that impose liability for the criminal conduct of common carriers in the area of obscenity. For example, if a common carrier had a financial interest in obscene communications carried over its network or was otherwise responsible in part for creating the obscene communications, the common carrier arguably could be liable for criminal conduct not preempted by federal law. In that situation, the common carrier would be acting as the information provider rather than solely as a common carrier. However, as the court has made clear, the Alabama anti-obscenity statute imposes liability only for Sprint's failure to report.

■■■ Similarly, Evans's argument concerning § 223(b) of title 47, which imposes criminal liability for obscene telephone communication, is not relevant to the issue here.[13] Evans claims that the legislative history of § 223 shows that Congress did not intend to preempt state laws criminalizing obscene communication. Regardless of whether Congress intended to preempt state laws imposing liability for criminal conduct

relating to obscene communications, Evans does not seek to impose liability for the criminal conduct regarding the use or transmission of obscene communications. Instead, he seeks to impose liability for failing to report complaints of offensive messages. Even assuming that the legislative history of § 223 has some relevance here, Congress's inclusion of a specific provision concerning obscene communications only reinforces the conclusion that Congress intended to preempt state laws affecting common carriers' abilities to provide efficient interstate communications. Accordingly, for the above reasons, the court finds that Sprint has shown a substantial likelihood of success on the merits of its preemption claim.[14]

iii.

■■■ Evans claims that even if enforcement of the Alabama anti-obscenity statute as to Sprint is preempted, the court must still abstain under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). There, the Supreme Court held that a federal court may not enjoin pending state criminal proceedings unless the plaintiff demonstrates that the challenged statute flagrantly violates express constitutional prohibitions, there is bad-faith enforcement, or there are other special circumstances.

The Eleventh Circuit Court of Appeals has held that, when preemption "is readily apparent ... and, because of preemption, the state tribunal is acting beyond the lawful limits of its authority," *Younger* abstention does not apply. *Baggett v. Department of Professional Regulation, Bd. of Pilot Comm'rs*, 717 F.2d 521, 524 (11th Cir.1983). As the court of appeals explained, in such a case, the principles of comity and "our federalism"

---

**12.** In reaching this conclusion, the court does not imply that the Alabama statute is preempted as it relates to intrastate communications or to the liability of information providers, as opposed to common carriers.

**13.** Section 223(b)(1) provides:

"(1) Whoever knowingly—
(A) within the United States, by means of telephone, makes (directly or by recording device) any obscene communication for commercial purposes to any person, regardless of

whether the maker of such communication placed the call; or
(B) permits any telephone facility under such person's control to be used for an activity prohibited by subparagraph (A),
shall be fined in accordance with title 18, or imprisoned not more than two years, or both."

**14.** Because the court finds that Congress intended to preempt the entire field of interstate regulation of common carriers, the court need not reach Sprint's contention that enforcement of the Alabama anti-obscenity statute subjects it to conflicting state and federal obligations.

that underlie the doctrine of *Younger* abstention are not implicated because the state has no interest in prosecuting complaints that it has no jurisdiction to initiate. *Id.*

More recently, in *New Orleans Public Service, Inc. (NOPSI) v. Council of City of New Orleans*, 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989), the Supreme Court focused on two issues in determining whether *Younger* abstention is appropriate in cases involving claims of federal preemption. First, the Court looked to the nature of the state's interest in the "generic proceedings" at issue in the case. *Id.* at 365, 109 S.Ct. at 2516. Although Evans relies on a state statute directed at the prosecution of the distribution of obscene matter, he really seeks, as shown above, to impose interstate reporting requirements on common carriers—in other words, the generic proceeding at issue is the regulation of interstate telecommunications by common carriers outside the context of the distribution of obscene matter. Evans has no interest in such interstate regulation.[15]

Second, the Court indicated that, even if the state has a substantial, legitimate interest in the proceeding, *Younger* would still not apply under the abstention exception for a state statute that is "flagrantly and patently violative of express constitutional prohibitions." *Id.* at 366, 109 S.Ct. at 2517 (quoting *Younger*, 401 U.S. at 53–54, 91 S.Ct. at 755). Therefore, the Court suggested that it agreed that, "even if a *substantial* claim of federal pre-emption is not sufficient to render abstention inappropriate, at least a *facially conclusive* claim is." *Id.* (emphasis in original). In fact, the Court noted that in *Public Utilities Comm'n of Ohio v. United Fuel Gas Co.*, 317 U.S. 456, 469, 63 S.Ct. 369,

376, 87 L.Ed. 396 (1943), it "upheld the order of a District Court enjoining the State Public Utility Commission from attempting directly to regulate interstate gas prices because such actions were '*on their face plainly invalid.*'" *NOPSI*, 491 U.S. at 366, 109 S.Ct. at 2517 (emphasis in original).

The conclusion that abstention is inappropriate where a facially conclusive claim of preemption is put forward is consistent with the holding of the Eleventh Circuit in *Baggett* that abstention is not required when preemption is "readily apparent." 717 F.2d at 524. Indeed, the Eleventh Circuit has cited its holding in *Baggett* approvingly in a case decided well after *NOPSI*. *See National R.R. Passenger Corp. v. Florida*, 929 F.2d 1532, 1537 n. 12 (11th Cir.1991). *See also Norfolk & Western Ry. v. Public Util. Comm'n of Ohio*, 926 F.2d 567, 573 (6th Cir.1991) ("'[F]acially conclusive' claims of federal preemption may be sufficient to support federal jurisdiction in a case in which abstention would otherwise be appropriate under *Younger*."). Here, because of Congress's clear intent, as described above, to preempt the field of interstate regulation of common carriers, preemption of the Alabama anti-obscenity statute against Sprint is "readily apparent" and "facially conclusive."[16] Accordingly, the court finds that *Younger* abstention is inappropriate in this case.[17]

### 2. Prior Restraint Claim

A state is "not free to adopt whatever procedures it pleases for dealing with obscenity ... without regard to the possible consequences for constitutionally protected speech." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66, 83 S.Ct. 631, 637, 9 L.Ed.2d

---

**15.** In contrast, the Court in *NOPSI* found that the state had a "substantial, legitimate interest in regulating *intra* state retail rates." *Id.*, 491 U.S. at 365, 109 S.Ct. at 2516 (emphasis added).

**16.** In contrast, the Court found that preemption was not "facially conclusive" under the facts in *NOPSI* because the state had "not sought directly to regulate *inter* state wholesale rates." 491 U.S. at 367, 109 S.Ct. at 2517 (emphasis added).

**17.** There is another basis for concluding that *Younger* does not apply here. In *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), the Supreme Court held that

*Younger* did not apply and declaratory relief was not precluded when no state criminal proceeding is pending and a federal plaintiff demonstrates a genuine threat of enforcement of a disputed state criminal statute. Throughout the above discussion the court has assumed that there were "ongoing state proceedings" which would arguably warrant the application of *Younger*. However, the events giving rise to this lawsuit, involving the subpoenaing of documents, do not constitute "on-going state proceedings" requiring the application of *Younger*. *See Monaghan v. Deakins*, 798 F.2d 632, 637 (3rd Cir.1986), *aff'd in part and vacated in part on other grounds*, 484 U.S. 193, 108 S.Ct. 523, 98 L.Ed.2d 529 (1988).

584 (1963) (citations omitted). Rather, the first amendment requires "that regulations of obscenity scrupulously embody the most rigorous procedural safeguards." *Id.* The Supreme Court has therefore held that a valid final restraint on expression may occur only after "a judicial determination in an adversary proceeding." *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 559–60, 95 S.Ct. 1239, 1247, 43 L.Ed.2d 448 (1975). It has also recognized, however, that a restraint prior to judicial review may sometimes also be warranted. But, because the risks of freewheeling censorship are much more formidable where the restraint precedes rather than follows a judicial determination, the Court has tolerated a system of prior restraint only where it meets strict and narrow safeguards. *See id.* at 560, 95 S.Ct. at 1247 (enumerating proper safeguards).

Initially, the court notes that, unlike *Council for Periodical Distributors Ass'n v. Evans,* 642 F.Supp. 552 (M.D.Ala.1986) (Thompson, J.), *aff'd in relevant part,* 827 F.2d 1483 (11th Cir.1987), the case here does not involve actions of a prosecutor that constitute direct prior restraint. Indeed, Sprint concedes that the Attorney General did not engage in direct prior restraint. Instead, Sprint contends that the threatened enforcement of the Alabama anti-obscenity statute against it forces the company to make content-based decisions as to which subscribers are using their 800 numbers for obscene communications. According to Sprint, this informal system constitutes an unlawful prior restraint by forcing it to make these decisions without the communications having been adjudged obscene by a neutral judicial officer and by forcing Sprint into becoming a state actor for the purposes of enforcing the Alabama anti-obscenity statute.

However, as Evans points out, "[f]or there to be *prior* restraint, there must first be *restraint.*" *Information Providers' Coalition for Defense of the First Amendment v. FCC,* 928 F.2d 866, 877–78 (9th Cir.1991). That is, to trigger operation of the doctrine, "there must be some suppression, prohibition, inhibition, hindrance or constraint or speech by government action or rule." *Id.* Although prior restraint is possible even without direct action by a state actor, Sprint has failed to show how it is restrained by the

threatened enforcement of the Alabama anti-obscenity statute against it. As explained above, to avoid liability under the Act, Sprint must either report a complaint of obscenity to a prosecuting attorney or initiate a declaratory judgment action to determine whether a subscriber's message is obscene. According to Evans, Sprint is not required to cease carrying a subscriber's messages until a court has adjudicated the subscriber's messages to be obscene. The obligations imposed by the statute do not appear to violate any of Sprint's rights under the first amendment.

Sprint claims that it will be forced to screen subscribers based on the content of their messages and that Sprint may decide to drop a subscriber due to the additional costs of making reports or bringing declaratory judgment actions. But if Sprint has no obligation to cease carrying the messages until they have been adjudicated obscene, Sprint can rely solely on the adjudication and will never need to screen subscribers or cease carrying their messages until the adjudication. Moreover, the imposition of additional regulatory costs on Sprint in this case would not, by itself, constitute prior restraint. Although it is conceivable that regulatory costs could be so burdensome as to force a common carrier to "take down" a subscriber rather than pay the regulatory costs, Sprint has not presented credible evidence that the additional costs here would be so onerous. If Sprint decides to block a subscriber's messages, that decision will not have been forced on the company by Evans. In fact, at the preliminary injunction hearing, counsel for Sprint conceded that he was "not exactly sure" that the "additional burden" on Sprint violated the first amendment. Accordingly, the court finds that Sprint has not shown a *substantial likelihood of success on the merits* of its prior restraint claim.

### B. Irreparable Harm

█ Sprint has shown that an indictment against it will cause it irreparable harm. Sprint has never before been indicted on criminal charges. The court finds that, because the long distance telecommunications market is highly competitive, an indictment against Sprint would cause great harm to its

business reputation and would jeopardize its status as a government contractor. Accordingly, Sprint has shown irreparable harm if the preliminary injunction does not issue.

### C. Harm to the Attorney General

Sprint has shown that the threatened injury, the criminal indictment, that will result if the temporary restraining order does not issue outweighs the possible harm to the Attorney General. Indeed, because the Attorney General has no interest in prosecuting Sprint in the first instance, the Attorney General will face no harm. In reaching this conclusion, the court has followed the Supreme Court's directive in *NOPSI* to look to "the importance of the generic proceedings to the state," *NOPSI*, 491 U.S. at 365, 109 S.Ct. at 2516. As shown above, although the Attorney General relies on a state statute directed at the prosecution of the distribution of obscene matter, the Attorney General really seeks to impose interstate reporting requirements on common carriers—in other words, the generic proceeding at issue is the regulation of interstate telecommunications by common carriers outside the context of the distribution of obscene matter. The Attorney General clearly has no interest in such interstate regulation.

### D. Public Interest

The preliminary injunction serves the public interest by ensuring that the national interest in fulfilling the goals of the Federal Communications Act—to provide comprehensive regulation and to avoid the "practical difficulties inhering in state by state regulation of parts of an organic whole"—will be upheld. *North Carolina Util. Comm'n v. FCC*, 537 F.2d 787, 796 (4th Cir.), *cert. denied*, 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976) (quoting *General Tel. Co. of California v. FCC*, 413 F.2d 390, 398 (D.C.Cir.), *cert. denied*, 396 U.S. 888, 90 S.Ct. 173, 24 L.Ed.2d 163 (1969)). The public has a substantial interest in ensuring that common carriers continue to provide efficient service to all members of the public without facing varying state obligations.

### III. CONCLUSION

Finally, it should again be emphasized that, in the preliminary stages of these proceedings, the court need not, and does not, reach the broader and more difficult issue of whether all applications of the Alabama anti-obscenity statute to interstate activity of common carriers are preempted by federal law. The court, instead, renders the limited preliminary holding that the unorthodox manner in which Evans seeks to apply the criminal statute to compel Sprint, as a part of its interstate activity, to take certain affirmative steps whenever the company receives a complaint that a subscriber's message is in any way offensive is preempted.

An appropriate injunction will be entered limited to this narrow holding and not otherwise encroaching upon Evans's authority to pursue prosecutions under the Alabama anti-obscenity statute.

### ORDER AND INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That the motion for a preliminary injunction filed by plaintiff Sprint Corporation on March 8, 1993, be and it is hereby granted; and

(2) That defendant James H. Evans, Attorney General of the State of Alabama, and his officers, agents, servants, employees, and those persons in active concert or participation with him who receive actual notice of this order, are each preliminarily ENJOINED and RESTRAINED from further pursuing any criminal proceedings against plaintiff Sprint Corporation, its subsidiaries, affiliates, officers, directors, employees, and agents for violations of §§ 13A–12–200.1, et seq., of the 1975 Alabama Code, based on the company's failure, whenever it receives a complaint from a caller that an 800 number subscriber's message is offensive in content, either to report the complaint to a prosecuting attorney or to institute a declaratory judgment action against the subscriber.