**SPRINT CORPORATION, Plaintiff,**

v.

**James H. EVANS, Attorney General of the State of Alabama, Defendant.**

Civ. A. No. 93–T–284–N.

United States District Court, M.D. Alabama, N.D.

Feb. 14, 1994.

---

Joseph B. Mays, Jr., Michael S. Denniston, Bradley, Arant, Rose & White, Birmingham, AL, Kevin R. Sullivan, Deborah M. Lerner, Kelley, Drye & Warren, Washington, DC, David M. Eisenberg, Arthur A. Chaykin, Sprint Corp., Kansas City, MO, for plaintiff.

Mark Englehart, H. Lewis Gillis, Thomas, Means & Gillis, P.C., Donald V. Watkins, Donald V. Watkins, P.C., Montgomery, AL, for defendant.

## MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

Plaintiff Sprint Corporation charges in this lawsuit that the Attorney General of Alabama's attempt, under the Alabama criminal anti-obscenity statute, 1975 Ala.Code §§ 13A–12–200.1, et seq., to prosecute it for providing interstate "800" telephone service violates federal law. In its complaint as amended, Sprint asserts three claims against defendant Attorney General James H. Evans: first, that application of the state statute is preempted by the Communications Act of 1934, 47 U.S.C.A. §§ 151, et seq.; second, that such application would constitute an unlawful informal system of "prior restraint" in violation of the first and fourteenth amendments to the United States Constitution as enforced by 42 U.S.C.A. § 1983; and, third, that, because Evans has adopted inconsistent interpretations of the statute's applicability to Sprint's provision of interstate 800 telephone service, the statute is unconstitutionally vague and therefore void under the fourteenth amendment. Sprint seeks declaratory and injunctive relief.

The court now has before it Evans's motion to refer certain issues to the Federal

Communications Commission ("FCC"), under the doctrine of "primary jurisdiction," and for an order to direct him to file a petition for a declaratory ruling on those issues with the Commission. For the reasons set forth below, the motion will be granted in part and denied in part.

## I. BACKGROUND

■ As this court described in an earlier opinion entered on April 7, 1993, *Sprint Corp. v. Evans*, 818 F.Supp. 1447 (M.D.Ala. 1993), Sprint is an international telecommunications company that provides voice, data, and video transmission services. As a carrier of telephone messages on its telecommunications network, it is a "common carrier" within the meaning of the Communications Act.[1] Among other services, Sprint provides an "800" service, which is offered to subscribers pursuant to tariffs filed with the FCC.[2] To subscribe to an 800 service plan, a subscriber submits a standard enrollment form, which does not require the subscriber to disclose the nature of its business or the purpose for which it intends to use the 800 service. Sprint has over 150,000 accounts for 800 service.

Under an 800 service plan, a consumer calls the 800 number and the party called—that is, the subscriber—is billed a prescribed amount for each minute as toll charges for the call. The 800 service plan, therefore, differs from regular telephone service in that the party called rather than the caller pays for the call. Sprint receives no payment based upon the sales success of the subscriber and has no ownership interest or financial relationship with any of its subscribers for 800 service. Sprint does not participate in the subscribers' billing of the callers to the 800 numbers.

To initiate an 800 service call, a person places the call through his or her local telephone company. The local telephone company then switches the call to a long distance carrier such as Sprint. To complete the call, the long distance carrier generally delivers the call to the subscriber's local telephone company, which then switches the call to the subscriber. Sprint handles over seven million 800–number calls during a normal business day.

If Sprint receives a complaint from a caller about an 800 service number, Sprint first verifies that Sprint, as opposed to another long distance company, operates the 800 number. Sprint also calls the 800 line itself to verify the content of the message. Sprint then informs the 800 subscriber that Sprint has received a complaint concerning the 800 service and asks that the subscriber contact the caller directly about the complaint. Once Sprint notifies the subscriber of the nature of the complaint, it takes no further action. Sprint receives approximately one complaint a week regarding its 800 service numbers.

■ On February 5, 1993, Sprint received a subpoena from the Montgomery County Grand Jury commanding it to appear on February 11, 1993, and to produce all records concerning 800 telephone numbers. The production request included all documents pertaining to 16 specific 800 numbers. Twelve of these numbers were issued to Network Telephone Services and to ALMARC, both of which are California companies. With respect to these services, a consumer places a call to the 800 number and is given recorded preliminary information by the service provider. After the caller arranges an alternative billing method, such as a credit card, the caller can then connect with another random caller, hear a prerecorded message, or speak live with an employee of the service provider. Both sides agree that all of the telephone numbers under investigation require interstate connections between the callers and subscribers. The calls originate in Alabama, but are completed in other states. As such, the calls involve interstate

---

1. 47 U.S.C.A. § 153(h) provides in relevant part: "'Common carrier' or 'carrier' means any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or in interstate or foreign radio transmission of energy."

2. As part of the Communications Act, Congress created the FCC as the central agency authorized to execute and enforce the provisions of the Act. *See* 47 U.S.C.A. § 151.

communications within the meaning of the Communications Act.[3].

Sprint produced documents to the grand jury in compliance with the subpoena. On February 16, an attorney for Sprint, David Eisenberg, contacted Alabama Deputy Attorney General Russell Duraski, who informed Eisenberg that the grand jury investigation concerned obscene materials by telephone. Duraski mentioned that "GTE" had previously been indicted on obscenity charges in Alabama but did not ask Eisenberg to or suggest to him that Sprint terminate any of its 800 numbers or even review the content of the 800 numbers. On February 19, another attorney for Sprint, Joseph Fine, contacted Attorney General Evans, who told him that Sprint was a target of the grand jury investigation. During the week of February 22, Duraski told Fine that the grand jury was scheduled to meet on February 25 and that the Attorney General's office would present evidence to the grand jury on that date. The Attorney General's office informed Fine that the date would be rescheduled. On March 2, Duraski told Eisenberg that the grand jury would convene again on March 10 to consider the matter.

On March 8, Sprint filed a motion for a temporary restraining order and a preliminary injunction, seeking to enjoin the Attorney General from pursuing a criminal indictment against Sprint for violating the Alabama anti-obscenity statute in connection with the company's provision of 800 telephone service. Sprint served the motion on the Attorney General the same day. On March 9, a hearing was held on the motion for a temporary restraining order. Sprint maintained that enforcement of the anti-obscenity statute against it would interfere with federal statutory rights and is preempted; regulation of interstate communications, according to the company, is within the exclusive jurisdiction of the FCC. Sprint also contended that enforcement of the statute would constitute an unlawful system of prior restraint. At the hearing, the Attorney General's office could not state that prosecution of Sprint was not imminent. The court orally informed the parties that a temporary restraining order would be entered and issued a written order and memorandum opinion the same day.

On March 19, the court held a hearing on the motion for a preliminary injunction.[4] Sprint reasserted its earlier arguments regarding preemption and prior restraint. In response to questions from the court, Donald Watkins, counsel for the Attorney General, clarified Evans's position regarding Sprint's liability under the state's anti-obscenity statute in connection with the company's 800 service.[5] According to Evans at that time, the statute requires Sprint to take one of two actions whenever it receives a complaint from a caller that a subscriber's message is

3. 47 U.S.C.A. § 153(e) provides in relevant part: " 'Interstate communication' or 'interstate transmission' means communication or transmission (1) from any State, Territory, or possession of the United States (other than the Canal Zone), or the District of Columbia, to any other State, Territory, or possession of the United States (other than the Canal Zone), or the District of Columbia, (2) from or to the United States to or from the Canal Zone, insofar as such communication or transmission takes place within the United States, or (3) between points within the United States but through a foreign country."

4. Initially, the hearing on the preliminary injunction was set for March 15. Upon agreement of the parties, the hearing was reset for March 19 and the temporary restraining order was amended to remain in effect until the court resolved the motion for a preliminary injunction, but was not to extend past March 26. This date was subsequently extended to April 6.

5. The relevant provisions of the Alabama anti-obscenity statute at issue in this case are as follow:

"It shall be unlawful for any person to knowingly distribute, possess with intent to distribute, or offer or agree to distribute any obscene material for any thing of pecuniary value. Any person who violates this subsection shall be guilty of a misdemeanor and, upon conviction, shall be punished by a fine of not more than $10,000 and may also be imprisoned in the county jail or sentenced to hard labor for the county for not more than one year."
1975 Ala.Code § 13–A–12–200.2(1). The statute defines the term "material" to include "any ... electrical or electronic reproduction, broadcast, transmission [or] telephone communication." § 13–A–12–200.1(2). The term "distribute" includes to "transmit, re-transmit [or] communicate by telephone." § 13–A–12–200.1(3).

offensive in content. Sprint must either report the complaint to a prosecuting attorney or institute a declaratory judgment action against the subscriber. If Sprint takes one of these two actions in response to a caller's complaint, then it is not criminally liable under the statute. According to Evans, Sprint is not obligated to cease carrying a subscriber's message, referred to as "taking down" a subscriber, while these actions are pending. Sprint is obligated to take down a subscriber only once a court has adjudicated the subscriber's message obscene and need not make its own independent determination as to whether a message is obscene.

Based upon this interpretation by Evans of the statute's applicability to Sprint, the court granted the preliminary injunction on April 7, 1993. *Sprint Corp. v. Evans,* 818 F.Supp. 1447 (M.D.Ala.1993). The court concluded that Evans's interpretation of the statute would operate as a regulatory reporting mechanism and, as such, was likely preempted by the Communications Act's comprehensive scheme for the regulation of interstate communication.[6] Evans was preliminarily enjoined from pursuing any criminal proceedings against Sprint for violations of §§ 13A–12–200.1, et seq. of the 1975 Ala. Code, based on the company's failure, whenever it receives a complaint from a caller that an 800–number subscriber's message is offensive in content, either to report the complaint to a prosecuting attorney or to institute a declaratory judgment action against the subscriber.

Evans and Sprint filed motions for summary judgment on May 28 and June 4, 1993, respectively. Subsequently, Evans represented to the court that he did not intend to apply the anti-obscenity statute as a regula-

tory reporting mechanism.[7] Instead, Evans now says that he intends to apply the statute in conjunction with 1975 Ala.Code § 13A–2–23 which imposes criminal liability for aiding and abetting the commission of a federal offense.[8] In granting the preliminary injunction on April 7, 1993, the court did not analyze whether such an application would be preempted.

Under Evans's current theory, it would be illegal for a common carrier such as Sprint knowingly to aid and abet a subscriber in its distribution of obscene materials. Because of the dispute over the anti-obscenity statute's potential application and Evans's shifting interpretations, the affidavit of Russell T. Duraski, the Deputy Attorney General charged with enforcing the statute—the most thorough discussion of Evans's current position—is quoted at length:

> "The Attorney General and the State of Alabama did not and do not *require* a common carrier such as Sprint to 'either report a caller's complaint [regarding the offensive nature of a subscriber's message] to an attorney general or institute a declaratory judgment action against the subscriber' to comply with the Alabama anti-obscenity statute (including when applied with the aiding and abetting provision). Instead, undertaking either such course may enhance Sprint's defensive posture *if* indictment and prosecution for violation of the statute were to ensue. Sprint's obligation is to comply with the Alabama statute; this obligation is based on a fact-specific analysis on a case-by-case basis; Sprint probably enhances its defensive posture against potential criminal liability under the Alabama Act when it makes a non-binding self-determination that mes-

---

**6.** The court did not "reach the broader and more difficult issue of whether all applications of the Alabama anti-obscenity statute to interstate activity of common carriers are preempted by federal law." *Sprint Corp.,* 818 F.Supp. at 1461. Specifically, the court stated: "the issue before the court is not whether a state statute criminalizing obscenity is preempted, but whether a state regulation requiring reporting of complaints is preempted." *Id.* at 1454.

**7.** Evans began to retreat from his prior interpretation when he filed a motion to reconsider is-

suance of preliminary injunction and denial of motion to dismiss on April 19, 1993. Subsequent hearings and briefs have brought Evans's current interpretation more clearly to light.

**8.** 1975 Ala.Code § 13A–2–23 provides in pertinent part:

> "A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense, ... [h]e aids or abets such other person in committing the offense."

sages transmitted over its lines are sexually explicit and potentially in violation of the Act, *and* takes specific affirmative steps to address this matter in those cases in which it has actual knowledge of the sexually explicit nature of the messages transmitted; and simply referring or reporting the matter to a law enforcement agency, standing alone, may not constitute a complete bar to potential criminal liability under the Act if there is other sufficient evidence which would warrant the indictment and prosecution of Sprint under the Alabama Act....

"The precise conduct which constitutes 'aiding and abetting' by a common carrier of an offense under the Alabama Act is necessarily fact-specific and has to be determined on a case-by-case basis....[O]ne possible preliminary theory of prosecution against Sprint is that Sprint, having knowledge of the sexually explicit nature of the telephone communications, aided and abetted the named information providers above in transmitting telephone communications by knowingly allowing its services to be used for such illegal purposes. Indeed, that evidence suggests that Sprint received consumer complaints that at least one of the 800 telephone numbers covered by the grand jury subpoena (and used by one of the indicted information providers) was used to transmit messages that were obscene, sexually explicit or otherwise offensive or 'adult' in content; a Sprint representative called the telephone number at issue, listened to the messages and made his own informal determination that the messages were 'dirty,' i.e., of a sexually explicit or 'adult' nature; and that the information provider continued to use Sprint services to transmit such messages....

"Sprint's general obligation under the Alabama Act is to avoid violating the Act, i.e., avoid knowingly distributing or allowing its facilities to be used to distribute obscene telephone messages....

"Sprint *may* at its option report such complaint to an appropriate state, local or federal authority; or petition an appropriate authority for a declaratory ruling whether the programming violates applicable law—all of which steps are authorized by the Federal Communications Commission. But whether Sprint (or other common carrier) files a declaratory judgment action, reports the complaint to an appropriate prosecuting authority or does neither, does not alter the elements of the potential criminal offense at all *nor* dictate whether action to enforce the Alabama Act by grand jury investigation will be taken by the Attorney General. The failure to pursue either course of conduct is not an element of an offense, either as a principal or an 'aider and abettor', under the Alabama Act. Neither is the pursuit of either course of conduct a bar to liability, an affirmative defense, or an absolute standard inducing the Attorney General not to take action to investigate possible violations of that Act.

"At most, evidence of a common carrier's action or failure to take action may be introduced and argued by either prosecution or defense in a criminal prosecution as evidence probative of the presence or absence of the requisite scienter."

Duraski Aff. ¶¶ 11, 13, 14, 15, 17, 18, 19 (emphasis in original). Thus, under Evans's current interpretation, it is the carrying of a subscriber's obscene message, including prior to an adjudication of obscenity, that is illegal under a theory of aiding and abetting,[9] and not the failure to report the subscriber's message.[10]

---

**9.** Evans reports that "At least two information providers with whom Sprint has done business, and who transmitted telephone communications over 800 numbers at issue in the original grand jury subpoena to Sprint have been indicted by the *Montgomery County* grand jury as 'principals' for violating the Alabama Act." Defendant's Brief in Opposition, at 19.

**10.** As noted above, the court has yet to consider whether such an application is also preempted by the broad scope of the Communications Act. *See* 47 U.S.C.A. §§ 151, 152. Under Evans's current theory of application, the court would also need to consider the preemptive effect of § 223 of the Act, which provides criminal penalties for knowingly permitting another to use a telephone facility under a party's control for an obscene communication.

On June 16, 1993, Sprint amended its complaint with leave of this court to add a claim that, because Evans's theory of Sprint's liability under the statute was inconsistent, the statute was void for vagueness under the fourteenth amendment [11]; Evans responded on July 26, 1993 with a motion for summary judgment on this claim. All motions for summary judgment remain pending before the court.

On December 22, 1993, Evans filed the instant motion to refer certain issues to the FCC under the doctrine of primary jurisdiction. Upon motion by Sprint, and without objection by Evans, this court modified the preliminary injunction on January 3, 1994, to enjoin Evans "from seeking to indict Sprint for the conduct underlying this action, or for any similar conduct, unless Sprint fails to conform its business practices prospectively consistent with any final resolution of this matter by this Court, following the Federal Communication Commission's determination of the issues referred."

Evans seeks referral of the following issues to the FCC:

(a) Whether Sprint or any other interstate common carrier, as defined by the Communications Act, may exercise its good faith, independent business judgment in refusing to carry sexually explicit telephone messages over its facilities for 1–800 service into Alabama or other jurisdictions, without risking liability under the Communications Act?

(b) Whether, consistent with the Communications Act, Sprint or any other interstate common carrier may enter into a *contractual agreement* with an information provider in connection with 1–800 service that requires the information provider to disclose the content of sexually explicit messages and allows such carrier to make determinations about whether to continue to carry the information provider's program based on: (1) representations made by the information provider; (2) a determination by the carrier's agents or employees that the information provider's programs contain sexually explicit messages; or (3) complaints received from or by any en-

forcement authority or consumers as to programs' content?

(c) Whether, consistent with the Communications Act, Sprint or any other interstate common carrier may *by tariff* prohibit the transmission of sexually explicit and potentially obscene interstate telephone communications in connection with 1–800 service? If so, may Sprint or such other carrier make determinations whether to carry an information provider's programs based on: (1) representations made by the information providers; (2) a self-determination by the carrier's agents or employees that the information provider's programs contain sexually explicit messages; or (3) complaints received from or by any enforcement authority or consumers as to message content?

(d) Whether, under the Communications Act, an interstate common carrier may be held liable for knowingly allowing its 1–800 facilities to be used to transmit obscene telephone communications interstate where the carrier has actual or constructive knowledge that its facilities are being used to transmit sexually explicit and potentially obscene communications and takes no steps to stop such transmissions, or may a common carrier terminate such communications only upon receipt of notice that the communication has been adjudicated obscene?

(e) Whether an interstate common carrier, having actual or constructive knowledge that its 1–800 facilities are being used to transmit sexually explicit interstate telephone communications, is barred by the Communications Act from exercising independent business judgment to terminate such service without an adjudication of obscenity?

(f) Whether an attempted criminal prosecution of an interstate common carrier under a state's anti-obscenity laws for knowingly transmitting (1) sexually explicit, potentially obscene telephone communications or (2) telephone communications that have been adjudicated obscene

**11.** Sprint's original complaint included only the preemption and prior restraint claims.

through its interstate 1–800 facilities is preempted by the Communications Act?

## II. DISCUSSION

### A. *Primary Jurisdiction Doctrine*

"Primary jurisdiction" is a common-law doctrine which comes into play when a claim, although cognizable in the courts, calls for resolution of issues which, "under a regulatory scheme, have been placed within the special competence of an administrative body." *United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). The doctrine is "a discretionary tool of the courts, a flexible concept to integrate the regulatory functions of agencies into the judicial decision making process by having agencies pass in the first instance" on certain issues in dispute. *Columbia Gas Transmission Corp. v. Allied Chemical Corp.*, 652 F.2d 503, 519 n. 14 (5th Cir. Aug. 1981).[12] The doctrine operates "to postpone judicial consideration of a case to administrative determination of important questions involved by an agency with special competence in the area." *Mercury Motor Express, Inc. v. Brinke*, 475 F.2d 1086, 1091–92 (5th Cir.1973). "It does not defeat the court's jurisdiction over the case, but coordinates the work of the court and the agency by permitting the agency to rule first and giving the court the benefit of the agency's views." *Id.* *See also REO Industries v. Natural Gas Pipeline Co.*, 932 F.2d 447, 456 (5th Cir.1991) (court "defers to an administrative agency for an *initial decision* on questions of fact or law within the peculiar competence of the agency") (emphasis in original).

■ The doctrine can be described as having two purposes: first, to ensure "[u]niformity and consistency in the regulation of business entrusted to a particular agency," *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 303–04, 96 S.Ct. 1978, 1987, 48 L.Ed.2d 643 (1976) (quoting *Far East Conference v. United States*, 342 U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952)), and, second, to ascertain "the expert and specialized knowledge of the agencies" before judicial consideration of the legal claim. *Western Pacific Railroad*, 352 U.S. at 64, 77 S.Ct. at 165. The agency determination need not be certain to end the dispute; rather, referral is appropriate where there is only a "strong possibility" that the agency decision would end the dispute, *Carter v. American Tel. & Tel. Co.*, 365 F.2d 486, 499 (5th Cir.1966), *cert. denied*, 385 U.S. 1008, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967), or where "a prior agency adjudication of [the] dispute will be a *material aid* in ultimately deciding" the issue. *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 305, 93 S.Ct. 573, 582, 34 L.Ed.2d 525 (1973) (emphasis added).

"No fixed formula exists for applying the doctrine of primary jurisdiction." *Western Pacific Railroad*, 352 U.S. at 64, 77 S.Ct. at 165. Courts, however, should be reluctant to refer an issue "when the agency's position is sufficiently clear" or "when the issue is peripheral to the main litigation." *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 532 F.2d 412, 419 (5th Cir.1976), *cert. denied*, 429 U.S. 1094, 97 S.Ct. 1109, 51 L.Ed.2d 541 (1977). Courts should also be reluctant "where the litigation deals with a single event which requires no continuing supervision by the regulatory agency." *Id.* In addition, courts applying the doctrine "must always balance the benefits of seeking the agency's aid with the need to resolve disputes fairly yet as expeditiously as possible." *Id.*

### B. *Application of Doctrine*

Each of the six issues Evans seeks to refer to the FCC involves the underlying preemption claims by Sprint in this lawsuit. The court, therefore, will briefly review the preemption claims raised by Sprint before determining which issues merit referral to the FCC.

#### 1. *Preemption*

■ The supremacy clause of article VI of the United States Constitution provides

---

**12.** In *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Congress with the power to preempt state law. *Louisiana Public Service Comm'n ·v. FCC,* 476 U.S. 355, 368, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986). In the absence of an express statement by Congress that state law is preempted, there are two other·bases for finding preemption. First, when the scheme of federal regulation is "so comprehensive as to make reasonable the inference that Congress left no room for the States to supplement it," the court should deem that Congress intended to preempt the whole field of state law by "implication." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). *See also Pacific Gas & Elec. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 212–13, 103 S.Ct. 1713, 1726–27, 75 L.Ed.2d 752 (1983). Second, state law is preempted to the extent it actually conflicts with federal law, either when compliance with both state and federal law is impossible, *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43; 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963), or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

■ In determining the preemptive scope of a particular federal law, the court's underlying task is to discern and effectuate the intent of Congress. *Cipollone v. Liggett Group, Inc.,* —— U.S. ——, ,——, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992) ("'The purpose of Congress is the ultimate touchstone' of preemption analysis") (quoting *Malone v. White Motor Corp.,* 435 U.S. 497, 504, 98 S.Ct. 1185, 1189, 55 L.Ed.2d 443 (1978)). The Supreme Court has cautioned that the striking down of state laws on preemption grounds is generally disfavored. "Consideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress.'" *Cipollone,* —— U.S. at ——, 112 S.Ct. at 2617 (citations omitted).

Sprint maintains that enforcement of the Alabama anti-obscenity statute would violate federal rights because the statute is preempted by the Communications Act. According to Sprint, there are two bases for finding federal preemption. First, the company contends that, in enacting the Communications Act, Congress established a comprehensive scheme for the regulation of interstate communications with the intent to preempt state laws in the field. Second, Sprint maintains that the Alabama anti-obscenity statute conflicts with Sprint's obligations under the Communications Act.

a. *Preemption by Comprehensive Scheme*

To the extent that Evans would apply the anti-obscenity statute as a reporting requirement, Sprint bases its claim that the Communications Act has fully occupied the field of interstate telecommunications regulation on § 152(a) of the Act, which provides that the Act "shall apply to all interstate and foreign communications by wire." [13] Sections 151 and 152(b) together implicitly delineate the areas of exclusive and. dual state and federal control. Section 151. explains that the purpose of the Act is to "regulat[e] interstate and foreign commerce in communication by wire and radio so. as to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges." Section 152(b) provides for a dual system of federal and state control over regulation of *intra*-state communication. [14] In

13. 47 U.S.C.A. § 152(a) provides in relevant part:

"The provisions of this chapter shall apply to all interstate and foreign communication by wire or radio and all interstate and foreign transmission of energy by radio, which originates and/or is received within the United States, and to all persons engaged within the United States in such communication or such transmission of energy by radio, and to the

licensing and regulating of all radio stations as hereinafter provided."

14. 47 U.S.C.A. § 152(b) provides in relevant part:

"[N]othing in this chapter shall be construed to . apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communica-

its order of April 7, 1993, the court found that the broad scope of the Communications Act would likely preempt all interstate regulation of common carriers, including enforcement of the anti-obscenity statute by Evans as a regulatory reporting requirement. *Sprint Corp.*, 818 F.Supp. at 1457.

To the extent that Evans would apply the anti-obscenity statute as a criminal regulation under a theory of aiding and abetting, as explained in Duraski's affidavit, Sprint relies on § 223 of the Communications Act to support its preemption-by-comprehensive-scheme argument.[15] Section 223 provides criminal penalties for knowingly permitting another to use a telephone facility under a party's control for an obscene communication. Although Evans argues that his application of the Alabama anti-obscenity statute would merely supplement § 223, Sprint would argue that Congress intended § 223 to have a preemptive effect. The court has yet to decide this question.

### b. *Conflict Preemption*

Sprint bases its claim that the Alabama anti-obscenity statute—under either of Evans's interpretations—conflicts with its obligations under the Communications Act on §§ 201 and 202 of the Act. Section 201(a) provides that "It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor." Section 202(a) states that "It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device," and subsection (c) provides financial penalties for any violations. Sprint argues that its obligations under Evans's interpretation of the anti-obscenity act—for ex-

ample, refusing to do business with a subscriber whose message Sprint unilaterally determines to be obscene—conflict with its overriding duty not to discriminate under the Act in the provision of its facilities and services. The court has yet to decide the question of preemption by conflicting obligations.

### 2. *Referral Issues "a" through "e"*

■ Referral issues "a" through "e" address the question of whether common carriers, consistent with the Communications Act, may refuse to carry an information provider's program transmitted as an 800 service, if the program contains sexually explicit information that has not been adjudicated obscene.[16] As such, they raise questions of a common carrier's non-discrimination duties under §§ 201 and 202 of the Act. They also raise questions of a common carrier's duties under § 223 not to permit the use of its telephone lines for obscene communications. Issues "a" through "e" seek the FCC's expert advice on the balance between these two federal obligations and a common carrier's obligations under a state's criminal anti-obscenity statute, such as the one Evans seeks to enforce against Sprint.

As such, issues "a" through "e" address the underlying considerations of conflict preemption, a question which is squarely before the court in this litigation. The court is convinced that the FCC's determination of these issues will assist it in deciding whether Evans's enforcement of the anti-obscenity statute against Sprint is preempted because it would subject Sprint to conflicting obligations—one of the critical questions in this litigation. The court finds it to be "very likely that a prior agency adjudication of this dispute will be a *material aid* in ultimately deciding" the questions under litigation. *Ricci v. Chicago Mercantile Exchange*, 409

tion service by wire or radio of any carrier, or (2) any carrier engaged in interstate or foreign communication solely through physical connection with the facilities of another carrier not directly or indirectly controlling or controlled by, or under direct or indirect common control with such carrier."

**15.** Apart from any consideration of § 223, Sprint would argue that the broad scope of the Act

under §§ 151 and 152 is alone sufficient to preempt this more recent interpretation of its liability under the anti-obscenity statute (in addition to the regulatory-reporting interpretation).

**16.** Issue "f", which asks the FCC for its opinion on the ultimate issue of preemption, is addressed separately below.

U.S. 289, 305, 93 S.Ct. 573, 582, 34 L.Ed.2d 525 (1973) (emphasis added). As to issues "a" through "e", Sprint is in agreement with Evans that referral to the FCC is appropriate.

Determining a common carrier's obligations under §§ 201, 202, and 223 of the Act is plainly within the "special competence" of the FCC. *Western Pacific Railroad,* 352 U.S. at 64, 77 S.Ct. at 165. The Communications Act establishes a comprehensive legislative scheme regulating interstate telecommunication carriers and the terms and conditions under which carriers provide interstate telecommunication services. The Act entrusts the regulation of interstate common carriers to the FCC. *See* 47 U.S.C.A. §§ 151, 152(b); *Louisiana Public Service Comm'n,* 476 U.S. at 369–70, 106 S.Ct. at 1899; *Carter,* 365 F.2d at 494. In addition, the Act requires each carrier to file tariffs with the FCC, for public display, setting forth its charges, classifications, regulations, and practices. 47 U.S.C.A. § 203(a). The FCC is empowered to review these tariffs to determine if the tariff is in violation of any of the provisions of the Act, and if so, to prescribe what practices or regulations would be just and reasonable. 47 U.S.C.A. § 205(a). Consequently, the FCC is "expert" at determining the rights and duties of a common carrier under the Act.

In addition to referral being appropriate under the primary jurisdiction doctrine in order to take advantage of "the expert and specialized knowledge" of the FCC, *Western Pacific Railroad,* 352 U.S. at 64, 77 S.Ct. at 165, it is also appropriate as a means of ensuring "[u]niformity and consistency in the regulation of business entrusted to a particular agency." *Nader,* 426 U.S. at 303–04, 96 S.Ct. at 1987. The questions raised by referral issues "a" through "e" warrant administrative guidance at a national level so that common carriers may conform their conduct to a single national standard. Moreover, determining the appropriate safeguards against the misuse of common carriers' facilities by subscribers to transmit obscene messages is a complex regulatory issue which can best be decided in the first instance by an agency with a thorough understanding of the economics and technology of the telecommunications industry.[17] *See National Communications Ass'n, Inc. v. American Tel. and Tel. Co.,* 813 F.Supp. 259, 263–64 (S.D.N.Y.1993) (question of whether certain billing practices, involving FCC-approved tariffs, were discriminatory under §§ 201 and 202 should be referred to FCC because of its "better insight and expertise" and the need to establish FCC policy).

The court finds no reason to be "hesitant" to apply the doctrine of primary jurisdiction to these referral issues. The conduct underlying this litigation is not a "single event," but rather involves ongoing business relationships maintained by Sprint and other common carriers with their subscribers, requiring "continuing supervision" by the FCC. *Mississippi Power,* 532 F.2d at 419. While the FCC has spoken generally to these issues on prior occasions, the court cannot conclude that the FCC's position is "sufficiently clear" as it applies to the manner in which Evans may seek to prosecute a common carrier such as Sprint. *Id.* [18] Issues "a" through "e" are central, not peripheral, to the main litigation. Finally, the court finds no reason to be concerned with undue delay in this case because both parties agree that referral of these issues is appropriate and both agree that the preliminary injunction, as modified, should remain in effect. *Id.* It is fully appropriate for this court to ask the FCC to determine, in the first instance, a common carrier's obligations under the Act. The FCC will thereby illuminate an important component of the court's preemption analysis. That is, the court must fully

---

**17.** The Communications Act specifically empowers the FCC to "prescribe such rules and regulations as may be necessary in the public interest" to effectuate the Act's purposes. 47 U.S.C.A. § 201(b).

**18.** The court has reviewed the FCC's decision in *Enforcement of Prohibitions Against the Use of Common Carriers for the Transmission of Obscene*

*Materials,* 2 F.C.C.R. 2819 (1987), and finds that it is not dispositive because, although it addresses a common carrier's liability for unwittingly servicing a subscriber with an obscene message, it does not speak directly to the implications raised by Evans's potential application of the Alabama anti-obscenity statute.

understand a common carrier's obligations under the Act before it can determine if the type of obligations sought to be imposed by Evans are in conflict and therefore preempted. The court, therefore, will refer issues "a" through "e" to the FCC and direct Evans to file a petition for declaratory relief for a determination of these issues by the FCC.

### 3. Referral Issue "f"

■ Referral issue "f" requests a determination of whether an attempted criminal prosecution of an interstate common carrier under a state's anti-obscenity laws for knowingly transmitting potentially obscene or obscene telephone communications through its interstate 1–800 facilities is preempted by the Communications Act. Sprint objects to referral of this question, and the court agrees that referral is neither appropriate nor required.

Unlike referral issues "a" through "e", which address the rights and duties of a common carrier under the Act, referral issue "f" addresses whether the Communications Act, as a matter of law, preempts criminal prosecution by state prosecutors. Thus, instead of asking the FCC to determine the obligations of common carriers—entities subject to its regulation and jurisdiction under the Communications Act—referral issue "f" would ask the FCC to determine the rights of a state prosecutor under a state anti-obscenity law. Referral issue "f" does not request the FCC to make determinations that would illuminate the court's preemption analysis, but rather requests the FCC to decide the ultimate question of preemption.

■ Although the question of preemption of state law is one that may be decided by the FCC in the course of its regulatory proceedings, for example, to determine if a state regulatory body should be handling a particular issue, it is not an area in which the FCC has any special competence or expertise. Any final decision made by the FCC about its power to preempt state regulation

is reviewable de novo by the United States Courts of Appeals. 28 U.S.C.A. § 2342(1). In *Louisiana Public Service Comm'n*, the Supreme Court refused to accord any special weight to the FCC's determination that certain state regulations were preempted and rejected the FCC's contention that preemption was necessary to fulfill its statutory obligation. 476 U.S. at 374–75, 106 S.Ct. at 1902 (invalidating preemption order). The Court stressed that preemption issues are to be decided by examining the intent of Congress, as determined by the "nature and scope of the authority granted by Congress to the agency," *id.* at 374, 106 S.Ct. at 1901; this analysis is one squarely within the expertise of a court of law.[19] As the former Fifth Circuit has written:

> "It is well established that courts need not refer an issue to an agency when the issue is strictly a legal one, involving neither the agency's particular expertise nor its fact finding prowess; the standards to be applied in resolving the issue are within the conventional competence of the courts and the judgment of a technically expert body is not likely to be helpful in the application of these standards to the facts of the case."

*Columbia Gas*, 652 F.2d at 519 n. 15 (declining to refer all issues to agency) (citations omitted).

The court concludes that the "standards to be applied [to Sprint's preemption claim] are within the conventional competence of the courts, and the judgment of a technically expert body is not likely to be helpful in the application of these standards to the facts of this case." *Nader*, 426 U.S. at 305–06, 96 S.Ct. at 1987–88 (holding that referral of an action for fraudulent misrepresentation to the Civil Aeronautics Board was not required) (footnote omitted). Issue "f", therefore, will not be referred to the FCC.

### 4. Referral Procedure

■ Because referral is appropriate with respect to issues "a" through "e", the court

---

**19.** There is no dispute that the telephone communications at issue in this litigation are interstate in nature. Cases where referral to the FCC was held to be appropriate to determine if a common carrier was operating as an *intra*state

carrier (a determination within the expertise of the FCC), and thus under state as opposed to federal jurisdiction, are therefore distinguishable. *See, e.g., GTE Sprint Communications Corp. v. Downey,* 628 F.Supp. 193 (D.Conn.1986).

will direct Evans to seek a petition for a declaratory ruling from the FCC on those issues. The FCC has the authority to hear and decide such petitions. 47 C.F.R. § 1.2 provides that "The Commission may, in accordance with section 5(d) of the Administrative Procedure Act [5 U.S.C.A. § 554], on motion or on its own motion issue a declaratory ruling terminating a controversy or removing uncertainty."

■ The court, of course, is mindful that the FCC is not required to grant Evans's petition for a declaratory ruling. It appears to the court, however, that a declaratory ruling would be proper in this case under the FCC's standards because the issues to be referred are of "general applicability" and extend beyond the controversy between the two parties. *See TRAC Communications, Inc. v. Detroit Cellular Tel. Co.*, 3 F.C.C.R. 4864, 4864 (1988). Regardless, the court concludes that "there is sufficient statutory support for administrative authority in this area that the agency should at least be requested to institute proceedings." *Ricci*, 409 U.S. at 304, 93 S.Ct. at 582.

■ Finally, while the court concludes that referral of issues "a" through "e" is appropriate under the doctrine of primary jurisdiction, referral does not affect this court's jurisdiction. The preliminary injunction, as modified, will remain in full force and effect. Referral under this doctrine only "suspends" the judicial process. *Western Pacific*, 352 U.S. at 63–64, 77 S.Ct. at 165.

An appropriate order will be entered.

### ORDER

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of this court:

(1) That the motion to refer certain issues to the Federal Communications Commission ("FCC"), filed by defendant Attorney General James H. Evans on December 22, 1993, is granted as to issues "a" through "e" and denied as to issue "f";

(2) That defendant Evans is DIRECTED to file a petition for a declaratory ruling with the FCC seeking a determination of the following issues:

(A) Whether Plaintiff Sprint Corporation or any other interstate common carrier, as defined by the Communications Act, may exercise its good faith, independent business judgment in refusing to carry sexually explicit telephone messages over its facilities for 1–800 service into Alabama or other jurisdictions, without risking liability under the Communications Act?

(B) Whether, consistent with the Communications Act, Plaintiff Sprint Corporation or any other interstate common carrier may enter into a *contractual agreement* with an information provider in connection with 1–800 service that requires the information provider to disclose the content of sexually explicit messages and allows such carrier to make determinations about whether to continue to carry the information provider's program based on: (1) representations made by the information provider; (2) a determination by the carrier's agents or employees that the information provider's programs contain sexually explicit messages; or (3) complaints received from or by any enforcement authority or consumers as to programs' content?

(C) Whether, consistent with the Communications Act, Plaintiff Sprint Corporation or any other interstate common carrier may *by tariff* prohibit the transmission of sexually explicit and potentially obscene interstate telephone communications in connection with 1–800 service? If so, may Plaintiff Sprint Corporation or such other carrier make determinations whether to carry an information provider's programs based on: (1) representations made by the information providers; (2) a self-determination by the carrier's agents or employees that the information provider's programs contain sexually explicit messages; or (3) complaints received from or by any enforcement authority or consumers as to message content?

(D) Whether, under the Communications Act, an interstate common carrier may be held liable for knowingly allowing its 1–800 facilities to be used to transmit obscene telephone communications inter-

 

state where the carrier has actual or constructive knowledge that its facilities are being used to transmit sexually explicit and potentially obscene communications and takes no steps to stop such transmissions, or may a common carrier terminate such communications only upon receipt of notice that the communication has been adjudicated obscene?

(E) Whether an interstate common carrier, having actual or constructive knowledge that its 1–800 facilities are being used to transmit sexually explicit interstate telephone communications, is barred by the Communications Act from exercising independent business judgment to terminate such service without an adjudication of obscenity?

It is further ORDERED that the clerk of the court shall certify a copy of the entire record in this case to be transmitted to the FCC along with defendant Evans's petition for a declaratory ruling.

It is further ORDERED that the parties shall advise the court promptly of any ruling or other determination of the FCC with respect to the petition for declaratory relief on the issues referred.

It is further ORDERED that the preliminary injunction issued by the court on April 7, 1993, and amended by the court on January 3, 1994, shall remain in full force and effect until further order by the court.

It is further ORDERED that the following motions are denied with leave to renew after the FCC has rendered its decision: (1) the motion and amended motion to reconsider issuance of preliminary injunction and denial of motion to dismiss filed by defendant Evans on April 19 and May 12, 1993; (2) the motion for clarification filed by defendant Evans on May 12, 1993; (3) the motions for summary judgment filed by defendant Evans on May 28 and July 26, 1993; (4) the motion for summary judgment filed by plaintiff Sprint Corporation on June 4, 1993; and (5)

the motion to strike filed by defendant Evans on July 7, 1993.*

---

* Because the issues presented in this litigation could be substantially different after the FCC has issued its ruling, the court believes it is best that, to the extent the parties may still wish to pursue their motions, they should renew them.